281 So.2d 572 (1973)
SAVE SAND KEY, INC., a Nonprofit Florida Corporation, Appellant,
v.
UNITED STATES STEEL CORPORATION, a Delaware Corporation, Appellee,
v.
STATE of Florida ex rel. Robert L. SHEVIN, As Attorney General of the State of Florida, Co-Plaintiff-Appellee.
No. 72-712.
District Court of Appeal of Florida, Second District.
July 19, 1973.
Rehearing Denied September 11, 1973.
Tom R. Moore, Clearwater, for appellant.
Thomas A. Clark, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, and Dennis P. Thompson, of Richards, Nodine, Gilkey, Fite, Meyer & Thompson, Clearwater, for appellee United States Steel.
McNULTY, Judge.
This may be said to be an "environmentalist" action; but vested public property rights rather than adverse ecological changes are essentially claimed, and the question herein is "standing" to sue.
Appellant Save Sand Key, Inc., a non-profit citizens' group, seeks to enjoin United *573 States Steel from interfering with certain alleged vested rights of its members in and to a portion of the soft sand beach area of Sand Key, a gulf-front island in Pinellas County. Such rights were heretofore enjoyed in common with the public and are said to have been acquired by prescription, implied dedication and/or general and local custom. Additional counts in the complaint seek injunctive relief from an alleged public nuisance in the form of a purpresture (i.e., a barrier) blocking enjoyment of those rights. The Attorney General of Florida joined as plaintiff.
Upon appellee's motion the trial court dismissed Save Sand Key, Inc. from the suit "with prejudice" for the reason that it "lacks standing" to sue. The court refused to dismiss the Attorney General, however, permitting him to pursue the action insofar as it pertains to the alleged public nuisance.[1] We reverse the dismissal of appellant Save Sand Key.
In ruling adversely to appellant the trial judge relied expressly on the decision of our sister court in the First District in Sarasota County Anglers Club, Inc. v. Burns.[2] In that case members of the plaintiff club were seeking to abate a public nuisance allegedly resulting from the dredging and filling of certain bottom lands over and to which plaintiffs claimed a right of recreational use and access in common with the public. The District Court affirmed a dismissal of the suit stating as grounds therefor, first, that there was no statutory authority to bring the action and, secondly, the plaintiffs had no standing to sue otherwise because they "... have failed to show in what manner they have been damaged as private citizens differing in kind from the general public. ..." (Italics ours.) Summarized, the holding was that except when provided otherwise by special statute, a private citizen can seek to abate a public nuisance only if he himself suffers or is about to suffer an injury different in kind from all other members of the public.
Necessarily, of course, that must be the holding of the lower court in this case. But we perceive a more profound and complex problem here. The full question to be answered in this case is whether an organization such as appellant which asserts certain vested property rights in the public generally, and thus derivatively in its members individually, can sue to enforce or protect those rights on behalf of those of its members who are personally aggrieved by an intrusion thereon, even though such rights are non-special and are enjoyable in common with every other member of the public.
In answering this question we first examine the basis of the trial court's ruling, and of that in Sarasota County Anglers Club. supra. In neither case was a statutory right of action involved, so relief was denied in each instance because the complainants suffered no alleged special injury differing in kind from that suffered by the public generally. Historically, this "special injury" concept finds its roots in public nuisance suits,[3] the theory being that the threat of multipliciousness in such cases is a greater evil than the nuisance. In the 1894 case of Jacksonville, T. & K.W. Ry. Co. v. Thompson,[4] for example, relief was denied a plaintiff who was seeking redress for an alleged obstruction of a public road by the defendant railroad "... `chiefly to avoid multiplicity of actions; for by the same reason that it may be brought by the plaintiff it may be maintainable by every person passing that way'... ." *574 Relief in such cases, if it was sought at all, had to be sought by the public official in whom the duty rested to look into these things. An individual's remedy, it was assumed, was at the ballot box if that public official was derelict in the premises.
A policy of judicial restraint  indeed passivity  thus arose in these matters in which the courts apparently considered as unreviewable the inaction of public officials in failing to exercise their official discretion in favor of abating public nuisances. This negative course was pursued rather than the affirmative one of taking cognizance of a potential right in an individual complainant to seek redress.[5] A policy, no doubt, which prompted the legislature in 1917 to authorize a private citizen to maintain a suit to abate certain public nuisances none of which, as in the Sarasota County Anglers Club case, supra, is involved here.[6]
But all too often, we observe, the aforesaid duty to abate nuisances rested overly long in the bosom of the appointed officials, and relief was indeed ultimately never attained by the public or anyone else. Moreover, with more than passing frequency, a public injury was created, encouraged or perpetuated by public officials themselves, witness the many taxpayers' suits attacking mischievous expenditures of public funds,[7] the mandamus actions to compel enforcement of valid laws or ordinances[8] and injunction suits to prevent enforcement of allegedly void laws or ordinances.[9] Understandably, of course, public officials were loathe to sue one another.
Yet even in those actions in which private citizens did undertake to sue, though such suits may not have been strictly "nuisance" suits, as such, the "special injury" concept spilled over and was early deemed to be a controlling principle on the question of standing. As a result, many a "right" went without protection. In general, it may be said, it developed that if almost any injury was suffered jointly with the public a single citizen so victimized could not be heard to complain unless his injury was special in that it differed in kind and degree from the public's.[10]
But it is anathema to any true system of justice to proclaim that a right may be enjoyed by all yet none may protect it. Accordingly, except in strictly nuisance cases to date, the obvious recent trend is to open the courts to afford relief to many more parties plaintiff than were heretofore entitled thereto under the "special injury" rule so broadly applied. As noted by Mr. Justice Boyd in Renard v. Dade County,[11] a suit to void a zoning ordinance, "... changed conditions ... require a more lenient application of [the special injury] rule ... ." Likewise, in Department of Administration v. Horne,[12] a taxpayers' suit to avoid an illegal appropriation, our Supreme Court speaking through Mr. Justice Dekle rejected the "special injury" rule in recognizing "standing" to sue when the plaintiff's attack was based on constitutional grounds. In doing so, the Horne court expressly relied on the United States Supreme Court case of Flast v. *575 Cohen,[13] a case illustrative of the recent thinking of the federal courts on the question. In Flast, the court departed from the "special injury" concept apparently first appearing in the federal system through Frothingham v. Mellon in 1923.[14] In the latter case, as in early Florida cases, the initial fear was of the vice of multiplicity. But such fear, it was held in Flast, was insufficient reason to close the courthouse door to a responsible taxpayer even though he was in no different position than every other taxpayer.
So the trend in Florida and in the federal courts is to broaden "standing to sue" assuming, of course, a stated cause of action based on some right or injury judicially recognized, and further assuming compliance with fundamental "case and controversy" principles, i.e., the requirement of a bona fide adversarial dispute.[15] Moreover, this trend is indeed mandated, we think, by our recently amended constitutional provision relating to access to our courts. Section 21, Declaration of Rights of the Florida Constitution, F.S.A.,[16] now provides that the courts "shall be open to every person for redress of any injury...." (Italics ours.) This language is clearly less restrictive than that of its precursor which provided that judicial redress was limited to cases involving injury to "lands, goods, person or reputation."[17] It is the obvious present intent of the people of Florida that the right to judicial relief be without express limitation.
We think it's time to say, therefore, that the "special injury" concept serves no valid purpose in the present structure of the law and should no longer be a viable expedient to the disposition of these cases. Given any right, fundamental justice demands its protection. We fear not multipliciousness, as did the earlier courts, because such fear ignores both the deterring economic influences flowing from the great expense of litigation these days and the precedential value of a prior decided case on a given point.[18] Furthermore, the increasing number of well-tried class actions tend to further limit litigation because of the principles which inhere within the doctrine of res judicata. Finally, we observe, "spite suits" or harassment will not be tolerated any more in this type suit than in any other. In a word, the "multiplicity" argument is no longer there.
We now consider whether the organizational plaintiff-appellant herein is a proper party to complain on behalf of some or all of its members. To begin with, we allude to the observations of the United States Supreme Court in Sierra Club v. Morton:[19]
"Whether a party has a sufficient stake in an otherwise justiciable controversy to *576 obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a `personal stake in the outcome of the controversy,' Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678, as to ensure that `the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." (Italics ours.)
In other words, the "traditional" or customary criteria for standing appear to be (1) the existence of a bona fide justiciable controversy presented in an adversarial context, and (2) that the party whose standing is challenged has such a personal stake in the outcome thereof so as to ensure that he will adequately and expeditiously represent the interest he asserts.[20]
In line with this and assuming for the moment the existence of a genuine justiciable controversy, the federal courts have long since recognized that a bona fide non-profit organization whose members share a lawful common interest is a proper party to complain of intrusions upon that interest.[21] Proven responsible organizational efforts in behalf of the common interests were considered sufficient "personal" involvement for the purpose of ensuring adequacy on the part of that organization to well represent such interests in a judicial forum.
Recently, our own Supreme Court apparently concurred with this aspect of standing in Cannery, Citrus, Drivers, Warehousemen and Allied Employees of Local 444 v. Winter Haven Hospital, Inc.[22] In that case a labor union was afforded "standing" to sue on behalf of three of its members who allegedly were individually aggrieved by illegal employer coercion. Mr. Justice Boyd first alluded to that court's enunciation in Shingleton v. Bussey:
"It can hardly be denied that one of the fundamental goals of modern procedural jurisprudence is to secure a method of providing efficient and expeditious adjudication of the rights of persons possessing adverse interests in a controversy... ."[23]
Thereafter, speaking for the court, he concluded that "... if the union were not given standing to sue on their behalf, it is questionable whether the employees would be afforded an `efficient and expeditious adjudication of their rights.'"[24] Likewise here, the bona fide and responsible collective efforts of the entire membership of the plaintiff organization, which in the present posture of the case we must assume to be established, will more readily assure adequate presentation of all phases of the controversy.
But there is one more facet of this "personal stake" aspect of standing which we must touch upon briefly, and that is that the right claimed or the injury complained of must be personal to the organization itself or to its members. As to this, we think an organizational plaintiff has a sufficient right or has suffered a sufficient injury in this context if all or some of its members have been or will be directly and personally aggrieved in some manner relating to, and within the scope of, the interests *577 represented and advanced by the organization.[25] Mere special interest in a public problem, or an assumed position as spokesman or representative of the public relating thereto, is not enough. This postulate, too, has been prima facie satisfied here. Although the assailed purpresture is allegedly interfering with the public's vested rights in and to the land in question, it is also alleged that the members of appellant organization are among that segment of the public directly and personally aggrieved thereby. This is enough.
Finally, now, on the issue of "standing," we consider whether there is a justiciable controversy herein, i.e., a stated cause of action. We think so, at least as to the well-pleaded facts within the rationale of the holding in City of Daytona Beach v. Tona-Rama.[26] In that case the court expressly recognized vested prescriptive rights in the public to a portion of the soft sand area of Daytona Beach. Under certain facts and circumstances, yet to be proven here of course, such rights may become absolute and enforceable. We need not now, however, reach alias theories of recovery or relief otherwise presented.
Summarizing our conclusions, then, we hold first, that a person who is entitled to enjoyment of a right or who directly and personally suffers or is about to suffer an injury may sue for relief or redress whether or not such right or injury is special to him or is shared in common with the public generally. Secondly, we hold that a bona fide non-profit organization may sue for and on behalf of some or all of its members who have been or will be directly and personally aggrieved in some manner relating to and within the scope of the interests represented and advanced by such organization. Finally, we hold, within the rationale of City of Daytona Beach v. Tona-Rama, supra, that facts and circumstances are alleged which, if true, are sufficient to support a finding that there exist enforceable prescriptive rights in the public to the soft sand area of Sand Key.
Our holding this day apparently collides with our prior decision in Askew, et al. v. Hold the Bulkhead-Save our Bays.[27] We there denied standing to plaintiffs who sought relief on behalf of the public from the commercial exploitation of a public park. While it is true that in that case there was no allegation that the complainants, themselves, were directly or personally aggrieved or had a "personal stake" in the outcome of the litigation, and that therefore the decision may well have been the same for this reason,[28] nevertheless the law enunciated in that case appears to perpetuate the archaic "special injury" rule we herein reject. Accordingly, to the extent it conflicts with this case, we expressly recede from and overrule that decision conceding readily that we may have reacted too quickly to the persuasion of stare decisis in following pre-1968 cases, i.e., those decided prior to the aforementioned constitutional amendment which we now think expands the right of access to the courts.
Withal, therefore, it is our conclusion that the judgment appealed from should be, and it is hereby, reversed; and the cause is remanded for full trial on the issues which may be joined by further pleading in the premises.
Reversed.
LILES, A.C.J., and HOBSON, J., concur.
NOTES
[1] The Attorney General has, since the filing of this appeal, taken a voluntary nonsuit. Accordingly, this controversy is now one solely between Save Sand Key, Inc. and appellee United States Steel.
[2] 193 So.2d 691 (Fla.App. 1967), cert. den. Fla., 200 So.2d 178.
[3] Jacksonville, T. & K.W. Ry. Co. v. Thompson, 34 Fla. 346, 16 So. 282 (1894); Garnett v. Jacksonville, etc. Railway Company, 20 Fla. 889 (1884); Lutterloh v. Mayor and Council of the Town of Cedar Keys, 15 Fla. 306 (1875).
[4] (1894), 34 Fla. 346, 16 So. 282.
[5] See, also, e.g., Berger, Standing to Sue in Public Actions: Is It a Constitutional Requirement? 78 Yale L.J. 816 (1969).
[6] See, history of §§ 60.06 and 823.05, F.S. 1973, F.S.A.
[7] See, e.g., Dept. of Administration v. Horne (Fla. 1972), 269 So.2d 659, and cases cited therein.
[8] See, e.g., State ex rel. Pensacola Greyhound Racing, Inc. v. Lechner (Fla. 1967), 195 So.2d 206.
[9] See, e.g., Renard v. Dade County (Fla. 1972), 261 So.2d 832, and cases cited therein.
[10] See, e.g., Boucher v. Novotny (Fla. 1958), 102 So.2d 132; O'Dell v. Walsh (Fla. 1955), 81 So.2d 554; Henry L. Doherty & Co., Inc., v. Joachim (1941), 146 Fla. 50, 200 So. 238; Rickman v. Whitehurst (1917) 73 Fla. 152, 74 So. 205.
[11] (Fla. 1972), 261 So.2d 832, 837-838.
[12] (Fla. 1972), 269 So.2d 659.
[13] (1968), 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947.
[14] (1923), 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078.
[15] See, Davis, The Liberalized Law of Standing, 37 U.Chi.L.Rev. 450 (1970) and Jaffe, Standing Again, 84 Harv.L.Rev. 633 (1971).
[16] As adopted November 5, 1968.
[17] Section 4, Declaration of Rights, Florida Constitution of 1885.
[18] "[T]he dockets ... have not increased appreciably as a result of the new cases in which standing would previously have been denied." Scanwell Laboratories v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859, 872 (D.C. Cir.1970). See, also, Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608, 617 (2d Cir.1965), cert. den., 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

Professor Kenneth C. Davis likewise points out that experience of the federal courts themselves shows that floods of litigation do not result when the judicial doors are opened to all. A 1953 case, Reade v. Ewing, 205 F.2d 630 (2d Cir.1953) held that a `consumer'  anyone who eats  has standing to challenge action of the Food and Drug Administration. If consumers have brought many cases, they must all be unreported. See Davis, supra, note 15 at 471.
[19] (1972), 405 U.S. 727, 731-732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636.
[20] See, also, Mr. Justice Blackmun's comments in his dissenting opinion in Sierra Club, id., with which comments the majority obviously agrees. The dissent was against the court's mandate, not the merits.
[21] See, e.g., N.A.A.C.P. v. Button (1963), 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405.
[22] 279 So.2d 23 (Opinion filed June 6, 1973). This case also involved, however, constitutional and statutory rights to bargain collectively.
[23] Shingleton v. Bussey (Fla. 1969), 223 So.2d 713, 718.
[24] n. 22 supra at 576.
[25] Cf. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Cannery. Citrus, Drivers, Warehousemen and Allied Employees of Local 444 v. Winter Haven Hospital, Inc., 279 So.2d 23 (Fla. 1973).
[26] (Fla.App. 1972), 271 So.2d 765.
[27] (Fla.App. 1972), 269 So.2d 696.
[28] See, Sierra Club v. Morton, n. 19, supra.