LETTS, Judge.
This appeal is taken from a Final Order entered by the Land and Water Adjudicatory Commission, its members consisting of the Governor and the Cabinet. The Commission’s order rescinded a permit, issued by the South Florida Water Management District, over the objections of its own professional staff, which authorized the construction of a 209 unit condominium complex with accompanying marina, restaurant and lounge. The actual site approved is to be found on Torry Island in Lake Okeechobee, inside the Herbert Hoover Dike and adjacent to the Rim Canal. Currently, a small fishing camp is to be found at that location.
We affirm the Commission’s Final Order and in so doing reproduce it, in its entirety, except for attachments, as follows:
FINAL ORDER
“This appeal came before the Land and Water Adjudicatory Commission (Commission) pursuant to Section 373.114, Florida Statutes, on April 1, 1986, in Tallahassee, Florida, for review of Surface Water Management Permit No. 50-01420-S issued by the South Florida Water Management District (the District) to George Michael Challancin and James Richard Challancin (Applicants) for a project known as J-Mark Fishing Village in Palm Beach County.
“The Florida Audubon Society and the Audubon Society of the Everglades (Audubon) filed a petition for this administrative proceeding with the Commission on January 28, 1986. Audubon argued that the permit issued by the District is inconsistent with Chapters 373 and 187, F.S., and various rules adopted by the District and the Department of Environmental Regulation.
“On March 17, 1986, the Department of Environmental Regulation (the Department) submitted a recommendation pursuant to Section 27G-1.13(7), F.A.C. The Department recommended that the Commission remand the permit to the District and direct the District to institute revocation proceedings based on the applicant’s failure to comply with Section 3.1.2 of the Basis of Review for Surface Water Management Permit Applications within the South Florida Water Management District (Basis of Review).
“A Motion to Remand to the District and a Response in Opposition were filed with the Commission by the District and Applicants, respectively.
FINDINGS OF FACT
“The Commission adopts and incorporates in this order the facts set forth in the permit application, the staff report prepared by the District, and the transcript of proceedings before the District on January 9, 1986 (attached as Exhibits A, B and C, respectively).
“In relevant part, those facts reflect that in October 1985, the applicants applied to the District for a general permit for a surface water management system. Applicants intend to develop a 209 unit condominium, a restaurant, pool, lounge and an existing boat basin and marina. The application represented that the applicant had acquired sketch plan approval from the City of Belle Glade.
“The development is located on Torry Island in Lake Okeechobee. The site and the lake lie entirely within the Herbert Hoover Dike. The dike surrounds the lake and functions as a water control structure. The District actively manages Lake Okeechobee which is Florida’s largest reservoir for flood control and fresh water supply.
“In 1978, the District paid $225,000.00 for a flowage easement allowing the District to raise the level of Lake Okeechobee to 19.5 feet.
CONCLUSIONS OF LAW
“(1) The Commission has jurisdiction over the subject matter of these proceed *1290 ings pursuant to Section 373.114(l)(a), F.S. Audubon is an affected person and Surface Water Management Permit No. 50-01420-S issued by the District has statewide or regional significance.
“(2) Section 373.114(c)^F.S., provides: “If the Land and Water Adjudicatory Commission determines that a rule or order is not consistent with the provisions and purposes of this chapter, it may, in the case of a rule, require the water management district to initiate rulemaking proceedings to amend or repeal the rule or, in the case of an order, rescind or modify the order or remand the proceeding to the water management district for further action consistent with the order of the Land and Water Adjudicatory Commission.
“(3) Section 3.1.2 of the Basis of Review states that ‘Before an Application will be considered for the issuance of a Construction or Operation Permit, the proposed land use must be compatible with the existing zoning. (Merely making application to local government for rezoning of the land will not suffice; any necessary rezoning must be officially obtained prior to the issuance of this District’s permit for construction or operation.)’
“The applicant filed a notice of intent for a general permit. Under Rule 40E-40.-112(2)(d), F.A.C., the applicant is required to submit ‘evidence from the local government verifying zoning compatability.’ In submitting the project the applicant indicated that ‘the City of Belle Glade issued “sketch plan” approval at the August 12, 1985 City Commission meeting.’
“The City of Belle Glade has a three step zoning process. The sketch plan approval is an initial step which does not rezone the property.
“At present, the property does not have the required zoning for the proposed use. Therefore, the permit application is inconsistent with Section 3.1.2 of the Basis of Review, and 40E-4.301(l)(j)(2), F.A.C.
“(4) 40E-4.101(l)(c), F.A.C., requires that all applications for permits filed with the District contain ‘Drawings, calculations, and engineering details sufficient to define the nature, scope, intent and functioning of the work proposed.’ The application submitted to the District Governing Board for a surface water management permit failed to include any documentation reflecting the applicant’s plans to expand the marina facility from 66 to 110 wet boat slips and the addition of 61 dry boat storage spaces. The fact that the District did not have the complete plans precluded the District from adequately determining the relative impacts from such an expansion prior to issuing the surface water management permit.
“(5) Rule 40E-4.301(1), F.A.C., requires that prior to issuing a permit the applicant must give reasonable assurances that the surface water management system:
“(b) will not cause adverse water quality and quantity impacts on receiving waters and adjacent lands regulated pursuant to Chapter 373, Florida Statues,
“(d) will not cause adverse impacts on surface and groundwater levels and flows,
“(1) will not otherwise be harmful to the water resources of the District, and will not interfere with the legal rights of others, as defined in Rule 17-40.07, ...
“The proper management of Lake Okeechobee, according to the uncontested facts, is an essential part of the District’s water management project. The presence of individuals inhabiting 209 condominium units on Torry Island will impinge upon the District’s ability to regulate the level of Lake Okeechobee. Chapter 373, F.S., provides a statutory frame work for water management and requires evaluation of conservation and protection of natural resources and protection of the integrity of the levee system and the water control system.
“In the event of a storm, the District may not be able to adequately protect the citizens of South Florida by raising the lake to a sufficient level in order to provide for flood control or water storage due to a concern for the safety of the large numbers of permanent residents at the J-Mark Fishing Village.
*1291 “(6) Rule 40E-4.301(l)(i), F.A.C., further requires that the District determine that the project is ‘the most publicly acceptable alternative available.’ Allowing high-density permanent residences on an island inside of the dike of Lake Okeechobee poses not only a public safety hazard, but directly conflicts with the stated policy of the State of Florida to restore and protect the natural values of Lake Okeechobee.
“(7) Rule 40E-4.301(l)(m), F.A.C., requires the applicant to provide reasonable assurances that the construction and operation permit ‘is not against public policy.’
“The State of Florida has a clearly stated policy of restoring and protecting Lake Okeechobee. In 1973, the Florida Legislature recognized the sifnificance [sic] of this state resource and authorized the ‘Special Project to Prevent Eutrophication of Lake Okeechobee.’ In 1986, the Florida Department of Environmental Regulation 9DER submitted a report to Governor Graham concerning the perilous state of the lake. DER stressed in its report that ‘time is running out to save this magnificant resource.’ This permit directly conflicts with the public policy and objectives of the State of Florida.
RECOMMENDATION
“Based upon the foregoing Findings of Fact and Conclusions of Law it is hereby ordered:
“(1) The Request for Review filed by Florida Audubon Society and the Audubon Society of the Everglades is granted and Surface Water Management Permit No. 50-01420-S issued by the South Florida Water Management District Governing Board is rescinded.
“(2) The Motion to Remand filed by the South Florida Water Management District is denied.”
We could affirm this Final Order without opinion. However, there are two aspects of it that merit discussion; namely the bare conclusions of law set forth therein that (1) the rescinded permit had “regional significance” and (2) that the Florida Audubon Society and the Audubon Society of the Everglades had standing as “affected person(s).” Section 373.114, Florida Statutes (1985) provides that the Land and Water Adjudicatory Commission can review the actions of any water management district if they are of “regional significance” and if requested to do so by “any affected person.” The statute itself does not further define the term “affected person” but Rule 27G-1.121(7) of the Rules of Appeal Procedure promulgated by the same Florida Land and Water Adjudicatory Commission does, as follows:
“Affected Person” shall mean any person or entity which demonstrates a specific interest that is adversely impacted by the subject rule or order.
It is questionable if this expanded definition, in terms of common understanding, is in fact any more explicit than the phrase it seeks to define. Nonetheless, such as it is, it is obviously germane to the controversy at hand and we shall discuss it.
At the outset, we must agree with the Commission that the permit here has regional significance. Lake Okeechobee is commonly referred to as “the liquid heart of South Florida.” Not only are millions of South Floridians dependent upon the Lake for the supply of life supporting fresh water, but, paradoxically, they are equally dependent upon it to ward off the calamity of too much of that same water generated by killer hurricanes and storms. As a consequence, high density development within its levees has regional significance, constitutes an awesome precedent and, as the required recommendation from the Department of Environmental Development under Rule 27G-1.13(4) reported to the Commission, is “contrary to the goal of preservation and upgrading of Lake Okeechobee.” Further the water management district’s own staff reported:
The proposed project is located approximately 2.5 miles from downtown Belle Glade, north of State Road 717. It is on *1292 Torry Island, adjacent to the Rim Canal in Lake Okeechobee. Water levels in the lake are managed in order to maintain a storage capacity up to 15.5 feet effective June 1st and up to 17.5 feet effective October 1st. The SFWMD has a perpetual flowage and storage easement over the lands described up to and including elevation 19.5 feet. The location of the project within the Herbert Hoover Levee interferes with the role of the lake as a managed reservoir system.
The location of the project also poses a threat to human lives and property. On August 26, 1949, a hurricane with winds clocked at approximately 80 mph crossed the northeast corner of the lake resulting in storm tides of 24 feet NGVD in the vicinity of the project site. The level pool stage at the time was 14 feet NGVD, significantly less than the current regulation stages. In addition, the Federal Emergency Management Agency’s estimate of 100 year flood elevations for this area is 28 feet NGVD. The minimum elevation of the unpaved access road appears to be 17.2 feet. Therefore, this stage would result in as much as 10 feet of water over sections of the access road to the project, making evacuation and emergency vehicle passage impossible.
Turning next to the problem of whether the Audubon Societies are “affected person(s)” or “entities.” The two Societies are nonprofit organizations which include in their corporate names, along with dual use of the word “Audubon,” reference to the “Everglades” or to “Florida.” These two entities are representative of Florida citizens and they have alleged in the request for review that they own land within the boundaries of the South Florida Water Management District. The word “Audubon,” as everyone knows, is derived from the famed naturalist John James Audubon and we take judicial notice of the fact that the raison d’etre of Audubon Societies is concern for the preservation of the environment, in this case in particular, the preservation of it in the Everglades and the South Florida Water Management District. In the sum of the foregoing, we conclude that they demonstrate the necessary “specific interest” under Rule 27G-1.121(7). See also Florida Wildlife Federation v. State Department of Environmental Regulation, 390 So.2d 64 (Fla.1980); Orange County Audubon Society v. Hold, 276 So. 2d 542 (Fla. 4th DCA 1973); Save Sand Key, Inc. v. United States Steel Corporation, 281 So.2d 572 (Fla. 2d DCA 1973).
We recognize that more than a “specific interest” must be demonstrated to determine the right of access to administrative proceedings and that Rule 27G-1.121(7) also requires “adverse impact.” The term “adverse impact” has been variously interpreted to include “impending injury” “substantially affected” “sufficient immediacy and reality” and, most frequently, “injury in fact.” There is an exhaustive, compelling and critical analysis of these above-quoted shibboleths in a recent article to be found in the Florida State University Law Review. Dore, Access to Florida Admin-istative Proceedings, 13 F.S.U. 967 (Winter 1986). However for our purposes here, we believe that the Audubon Societies would qualify under any of the quoted phrases, if indeed those phrases are not intended as synonyms.
An important case discussing the “injury in fact” test[1] is Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In that opinion, the Supreme Court of the United States held that the Sierra Club (an organization not unlike the Audubon Society, “with a historic commitment to the cause of protecting our Nation’s natural heritage from man’s depredations” Id. 92 S.Ct. at 1368) had no standing to obtain judicial review of a Walt Disney project. The project contemplated the construction *1293 of a ski resort, complete with motels, restaurants, swimming pools and other supporting services. This resort was planned to be located in an area of hitherto relative inaccessibility and sylvan natural beauty, adjacent to the Sequoia National Park in the Sierra Nevada mountains. The Sierra Club fought to preserve this “quasi-wilderness” from commercialization on aesthetic and environmental grounds, but the Supreme Court denied the Club standing because although “aesthetic and environmental well being ... are important ingredients in the quality of life in our society ... the injury in fact test requires ... that the party seeking review [must] be himself among the injured.” The Court then held that the Sierra Club was not among the injured because the Club had not alleged that it, or any of its members, would use, or be affected by, the project which would do no more than lessen the aesthetic and environmental values of the area sought to be preserved. But see United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).
Sierra is easily distinguished from the case now before us. Indeed, we believe Sierra's language supports affirmance here. First of all, the Audubon Societies have alleged actual ownership of land in the district and are obviously using it. Moreover, we are not dealing simply with parcels of immovable real estate which has prompted some courts to predicate the presence or absence of standing on whether the parcels involved are remote or proximate to each other. See Schatz v. Environmental Regulation Commission, 500 So.2d 167,169 n. 3 (Fla. 1st DCA 1986), rev. denied, 504 So.2d 766 (Fla.1987); Hills-boro-Windsor Condominium Association v. Department of Natural Resources, 418 So.2d 359 (Fla. 1st DCA 1982); Greene v. State Department of Natural Resources, 414 So.2d 251 (Fla. 1st DCA 1982). Sub judice, we are dealing primarily with vast quantities of water designed to flow, and or be controlled, throughout the district for the use and protection of property owners.
A second distinction from Sierra is that the case at bar does not merely involve aesthetics and a lessening of environmental values; it concerns, as we have already said, the prevention of a catastrophic loss of South Florida’s water supply and alternatively the holding back of devastating flood waters. One has only to reread one of the several paragraphs in the Final Order to realize the enormity of the potential injury in fact to landowners in the district. We repeat it for emphasis below:
In the event of a storm, the District may not be able to adequately protect the citizens of South Florida by raising the lake to a sufficient level in order to provide for flood control or water storage due to a concern for the safety of the large numbers of permanent residents at the [proposed development].
One last remaining concern with this “adverse impact” or “injury in fact” terminology is that of imminence. In other words, must the person be affected now? Obviously, the residents of South Florida are not without water today. Furthermore, there are no raging floods at this moment spilling over from the Lake. Are we then engaging in the kind of “speculation and conjecture” that concerned the court in the Florida Department of Offender Rehabilitation v. Jerry, 353 So.2d 1230 (Fla. 1st DCA 1978), cert, denied, 359 So.2d 1215 (Fla.1978)? We believe the answer to both questions is: No.
The record may be insufficient to support a claim that this particular development creates any immediate threat to the water supply. However, the precedent will trigger countless other applications which might have to be approved if this one is permitted. Moreover, on a long term basis, the Final Order speaks to the “eutrophication” of, and the “perilous state” of, “this magnificent resource” which “time is running out to save.”
As to flooding, there is competent and substantial evidence in the record to support the claim that the development poses a clear and imminent threat to flood control in the district as the quoted district’s staff *1294 report clearly establishes. In Cox v. South Florida Water Management District, 450 So.2d 288 (Pla. 4th DCA 1984), we considered a case in which it was alleged that a party had no standing to oppose water restrictions, planned by the district, because there was no existing drought, only a threat of it and therefore no need to implement the restrictions at the time of the opposition. We held there was standing noting that:
We can all take judicial notice of the fact that Florida’s never ending preoccupation with the delicate balance of its water supply is more than mere speculation. Droughts and floods are to Florida what sand is to the Sahara Desert — inevitable.
Accordingly, we reject any suggestion that it is necessary to suffer actual inundation before affected persons can be said to have standing.
In conclusion, we hold that the controversy is of regional significance and that the two Audubon Societies are affected persons with a specific interest which would be adversely impacted by the proposed development. They, therefore, have standing.
We do not find any of the other points on appeal to constitute reversible error.
AFFIRMED.
GLICKSTEIN and GUNTHER, JJ., concur.

. We do not address the companion “zone of interest” test. The "injury in fact" test is discussed because of its equation to "affected persons” under the Florida Statute which has no language addressing a "zone of interest.”